**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:25-CV-00729 |
| | ) | |
| SEAN PATRICK DOUGHERTY, | ) | **JURY TRIAL DEMANDED** |
| Serve:  2578 Coppergate Square Dr. | ) | |
| Apt.K | ) | |
| St. Louis, MO 63129 | ) | |
| | ) | |
| | ) | |
| AMBER DAVIS, | ) | |
| Serve: 5359 Camelot Estates Drive | ) | |
| St. Louis, MO 63129 | ) | |

Defendants.

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW State Farm Fire & Casualty Company ("State Farm"), by and through its undersigned counsel, and for its Complaint for Declaratory Judgment, states as follows:

1.    State Farm brings this action seeking the interpretation of certain insurance policies and a declaration of its rights and obligations thereunder, concerning claims asserted against its insured Sean Patrick Dougherty by Amber Davis arising out of incidents that allegedly occurred from 2015 to 2023.

**PARTIES, JURISDICTION, AND VENUE**

2.    Plaintiff State Farm is and was at all times mentioned herein a corporation incorporated under the laws of the State of Illinois with its principal place of business in the State

1

of Illinois, and therefore a citizen of the State of Illinois, engaged in the business of insurance and licensed to transact that business in the State of Missouri.

3.     Plaintiff State Farm issued the policies that are the subject of this declaratory judgment action.

4.     Upon information and belief, Defendant Sean Patrick Dougherty (hereinafter "Defendant Dougherty") is an individual domiciled in the State of Florida and, therefore, a citizen of Florida.

5.     Upon information and belief, Defendant Amber Davis (hereinafter "Defendant Davis") is an individual domiciled in the State of Missouri and, therefore, a citizen of Missouri.

6.     This case and controversy involve citizens of different states.

7.     The insurance policies at issue in this matter each have a liability limit of $300,000 per occurrence.

8.     Based on the allegations in the underlying claim (but without making any admission as to the merits thereof), the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     The United States District Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs and because complete diversity of citizenship exists between Plaintiff and Defendants.

10.     Venue is proper in the United States District Court for the District of Missouri under 28 U.S.C. § 1391(a) because a substantial amount of the events and occurrences giving rise to this action occurred in this District in that all Defendants are citizens of Missouri; the Policies upon which this action is premised were entered into in Missouri; the dispute involves injury that was

2

inflicted in St. Louis County, Missouri; and Missouri law applies to the interpretation of the Policies and the parties' rights and duties thereunder.

11.    This Court "may declare the rights and other legal relations of any interested parties seeking such declaration" pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) with respect to the policy of insurance issued by State Farm, and all above referenced parties are interested parties with respect to the determination of rights pursuant to the insurance policy issued by State Farm.

12.    An actual justiciable controversy exists between Plaintiff and Defendant Dougherty. In particular,

    a.  Defendant Davis has sued Defendant Dougherty in a state court lawsuit, as set out in more detail below.

    b.  Defendant Dougherty tendered the original petition in the state court lawsuit to Plaintiff, who initially disclaimed coverage for the allegations therein. Thereafter, an amended petition was filed in the state court lawsuit in October 2024, which Defendant Dougherty tendered to Plaintiff on January 2, 2025.

    c.  After receiving the amended petition, State Farm undertook Defendant Dougherty's defense in the lawsuit under a reservation of rights and notified him of the same through correspondence dated January 22, 2025.

    d.  Plaintiff disputes that it owes any duty to defend or indemnify Defendant Dougherty in that lawsuit or any judgment resulting therefrom. Thus, an actual controversy exists between Plaintiff and Dougherty.

13.    Furthermore, an actual controversy exists between Plaintiff and Defendant Davis. In particular:

e.   Davis is seeking a judgment against Dougherty in the underlying action.

f.   MO. REV. STAT. 379.200 authorizes a judgment creditor the right to proceed against an insurer if the insured fails to satisfy a final judgment within 30 days after the judgment.

g.   In addition, Plaintiff disputes that it owes any duty to indemnify any such judgment based on the applicable insurance policy, as set forth below. Thus, an actual controversy exists between Plaintiff and Defendant Davis.

14.    Litigation as to this controversy is imminent and inevitable, and the resolution of the matters raised in this declaratory judgment action will dispose of the issues and disputes between the parties.

15.    All necessary and proper parties are before the Court for the matters in controversy.

16.    State Farm has no other adequate remedy at law.

**FACTUAL ALLEGATIONS OF UNDERLYING CLAIM**

17.    On October 18, 2024, Defendant Amber Davis filed an amended petition entitled "Second Amended Petition"[1] in the Circuit Court of St. Louis County, Missouri ("Underlying Petition"). A copy of the Underlying Petition is attached hereto as Exhibit A.

18.    The Underlying Petition names Defendant Sean Patrick Dougherty as the sole defendant.

---

[1] Although the operative Underlying Petition is styled "Second Amended Petition," it is the only amended petition filed thus far in the underlying state court action.

19.     The Underlying Petition alleges that from late 2015 through May 2023, Dougherty engaged in a pattern of "romance fraud," managing to extract over $300,000 from Davis, using fraudulent misrepresentations and violent coercion.

20.     The Underlying Petition alleges that throughout their romantic relationship carried on from 2015 to 2023, Dougherty repeatedly convinced or coerced Davis to spend or lend him money by, among other things, promises that they would get married, angry and physically violent outbursts, verbal abuse, and threats of suicide or of harm to Davis or her family.

21.     Eventually, the Underlying Petition alleges, Defendant Dougherty abandoned his relationship with Davis and moved to Florida without repaying her.

22.     The first cause of action alleged in the Underlying Petition against Defendant Dougherty is for **"Money Had and Received"** in **"Count 1"**, in which Defendant Davis alleges the following:

> a.     "Defendant received and obtained possession of Plaintiff's money, including money from her bank accounts, credit accounts, personal property, and money contributed to the purchase and improvement of real property."
>
> b.     "Defendant appreciated a benefit of the money received from Plaintiff in that he retained and applied the funds received to accounts he controlled and for the purchase of real and personal property."
>
> c.     "Defendant retained the money received for his own benefit under unjust circumstances."

5

    d.   "Pleadings alternatively or hypothetically pursuant to Mo. Rev. Stat. 509.110, Defendant was unjustly enriched by the funds received from Plaintiff Davis."

    e.   "As a result of the aforementioned, Plaintiff has suffered significant damages, including the complete denial of control and access to funds exceeding $300,000.00. Plaintiff has further suffered emotional distress as a result of the funds being so unjustly retained."

    f.   "Defendant intentionally hurt Plaintiff Davis by unjustly retaining the funds."

23.    The second cause of action alleged in the Underlying Petition against Defendant Dougherty is for **"Fraudulent Misrepresentation"** in **"Count 2"**, in which Defendant Davis alleges the following:

    a.   "Defendant Dougherty, throughout the course of his relationship with Plaintiff Davis and culminating in the May '23 statements, represented to Plaintiff Davis that he would not take money from her credit or cash accounts without her prior approval."

    b.   "Defendant Dougherty repeated reaffirmance of this promise was material to Plaintiff Davis continuing to allow access to Davis' funds."

    c.   "Dougherty intended that Davis rely on the affirmations in continuing to lend the money."

    d.   "Plaintiff Davis was ignorant at all times of the falsity of the representation."

     e.   "Plaintiff Davis relied upon Dougherty's representation when continuing to allow such access."

     f.   "Plaintiff Davis reliance upon the representation was reasonable in that Dougherty continued and repeatedly made assurances that the representation was to be relied upon."

     g.   "As a result of Plaintiffs reliance on the above described representations, Plaintiff Davis has suffered serious damages. Plaintiff Davis has lost significant amounts of money, in addition to sustaining attorney's fees and costs."

     h.   "Defendant Dougherty intended to harm Plaintiff Davis."

24.    The third through tenth causes of action alleged in the Underlying Petition against Defendant Dougherty are for **"Assault and Battery"** in **"Counts 3–10"**, in which Defendant Davis alleges the following:

     a.   "Defendant Dougherty intended to cause harmful or offensive conduct, or apprehension thereof, on at least the following occasions:

          i.   "December 2018: Defendant Dougherty violently threw items at Plaintiff Davis; Defendant Dougherty screamed at Plaintiff Davis; Defendant Dougherty shoved Plaintiff Davis."

         ii.   "February 2020: Defendant Dougherty pushed Plaintiff Davis in the chest a few weeks after Davis had major abdominal surgery."

        iii.   "July 2020: Defendant Dougherty wielded a gun at Plaintiff Davis, directing her to kill him while he killed her; Defendant Dougherty

brandished said weapon at Plaintiff Davis, shooting randomly off of his deck."

iv. "July 2020: Defendant Dougherty attacked Plaintiff Davis, twice throwing her down in the parking lot, causing serious injury."

v. "August 2020: Defendant Dougherty grabbed Plaintiff Davis by the head, screaming at her that he wanted to put his first through her face and so badly wanted to hurt her."

vi. "August 2022: Defendant Dougherty shook Plaintiff Davis, hitting her head on the wall, and then threw her on the sofa, continuing to violently shake and scream at her while kneeling over her."

vii. "September 2022: Defendant Dougherty attempted to prevent Plaintiff from leaving by first standing in front of the door. When he allowed her to leave, Dougherty slammed the door on her hand, leaving Davis' fingertips on the other side of the door. Dougherty then locked the deadbolt. The flesh was torn open, exposing tendons and underlying bone. One of the injured fingers was fractured."

viii. "January 2023: Defendant Dougherty attacked Plaintiff Davis when she came to his condo, charging her and throwing her against a wall, causing her to fall to the ground."

b. "All of the above described assaults and/or batteries were intended to harm Plaintiff Davis."

c. "As a result of the above described assaults, Plaintiff Davis has suffered serious injury. Plaintiff Davis has suffered emotional distress and lost

wages. Plaintiff Davis has suffered diminished earning capacity and medical damages in the past, and will suffer the same in the future."

25.     The eleventh and final cause of action alleged in the Underlying Petition against Defendant Dougherty is for **"Negligent Infliction of Emotional Distress"** in **"Count 11"**, in which Defendant Davis alleges the following:

a.     "Defendant Dougherty had a legal duty to protect the Plaintiff from injury."

b.     "Defendant Dougherty breached that duty."

c.     "Defendant Dougherty acted negligently in the following manners and particulars and such further acts to be revealed in the course of discovery:

i.     "June of '16 Defendant Dougherty became violently angry and aggressive in front of Plaintiff Davis for the first time in their relationship, screaming at Plaintiff Davis over his revoked license until she complied with his demand to provide him rides. This continued onward until 2024."

ii.     "Defendant Dougherty's related to Plaintiff Davis that he had a violent boost [sic] in an AT&T store and attacked a customer after becoming enraged with them."

iii.     "September of '16: Defendant Dougherty threatened that Plaintiff Davis that he would physically hurt her and her mother."

iv.     "December '18: Defendant Dougherty kept Plaintiff Davis awake for 36 hours straight and became angry after Plaintiff Davis refused to spend further time with him."

v. "Defendant Dougherty continued to disrupt Plaintiff Davis' sleep onward while she was working 3 different jobs for approximately 100 hours a week."

vi. "October '19: Defendant Dougherty convinced Plaintiff Davis to come paint his house even though she was supposed to be on bedrest after her surgery."

vii. "June '20: After getting intimate with Plaintiff Davis, Defendant Dougherty told her that right before coming to her, he had been with another woman. He threatened to go back on dating apps if Plaintiff Davis did not comply with his demands."

viii. "August '20: Defendant Dougherty continuously threatened to kill himself when things would not go his way."

ix. "Defendant Dougherty showed Plaintiff Davis his gun collection and offered Plaintiff Davis a gun instructing that both of them should commit suicide together."

x. "Defendant Dougherty continuously spent large amounts of money on personal items while using Plaintiff Davis' money, especially during the time he would become angry with her."

xi. " '20: Defendant Dougherty expressed that he and Plaintiff Davis would not get back together, a desire to kill himself, and proceeded to tell Plaintiff Davis about a woman whom he would have a sexual intercourse with the same night that Plaintiff Davis was spending

time with her family and did not bring cake to Defendant Dougherty."

xii. "Defendant Dougherty continued to send Plaintiff Davis pictures of different women he alluded to having sexual intercourse with for as long as Plaintiff Davis refused to comply with his demands."

xiii. "Defendant Dougherty promised to cheat on Plaintiff Davis."

xiv. "Defendant Dougherty promised to kill Plaintiff Davis' mother."

xv. "Defendant Dougherty disregarded Plaintiff Davis' health condition during sexual intercourse. Defendant Dougherty would not let Plaintiff Davis free until he reached his 'satisfaction', often leaving Plaintiff Davis in tears, suffering through excruciating pain in her abdominal and pelvic area. Often, Defendant Dougherty would get angry at Plaintiff Davis during their intimacy."

xvi. "Defendant Dougherty openly shared violent fantasies of killing people and police officers with Davis."

xvii. "December '22: Defendant Dougherty called Plaintiff Davis' 'retarded' for not being able to write him a check before a couple messages after he told her he 'loved her'."

xviii. "Defendant Dougherty called Plaintiff Davis on the phone, told her he is going to kill himself, and proceeded to ignore her subsequent calls and messages."

xix. "Defendant Dougherty used the 'silent treatment' continuously throughout his relationship with Plaintiff Davis to punish her for refusing to comply with his demands."

xx. "Defendant Dougherty continuously reminded Plaintiff Davis that she was not 'submissive' enough and that her current personality was unattractive."

xxi. "Defendant Dougherty forced Plaintiff Davis to watch videos of reported violence and abuse toward women."

xxii. "Defendant Dougherty often forgot Davis' birthday, and on one such instance, he asked Davis to come cook him dinner."

xxiii. "Defendant Dougherty fantasized about killing Plaintiff Davis' mother even though Plaintiff Davis' mother has passed in December of 2022."

xxiv. "Defendant Dougherty told Plaintiff Davis that she was embarrassing him when Plaintiff Davis hurried to find Defendant Dougherty at a bar after he said he would 'blow his head off'."

xxv. "Defendant Dougherty purchased two sets of blue eye contacts for Plaintiff Davis to wear because he hated her eye color. He also contacted Plaintiff Davis' hairdresser, demanding to get her hair dyed red so that she could look the way she wanted."

xxvi. "Defendant Dougherty berated and repeatedly blamed Plaintiff Davis for his arrest for domestic assault and Plaintiff Davis' care about his well-being."

12

xxvii.  "Defendant Dougherty blamed Plaintiff Davis for Defendant's inability to have a job as a result of the aforementioned arrest."

xxviii.  "Defendant Dougherty blamed being in a relationship with Plaintiff Davis as the source of his inability to hold assets and pay Plaintiff Davis back over $100,000 of debt."

xxix.  "Defendant Dougherty in a conversation with his friend John, memorialized in a voicemail Plaintiff Davis listened to, hypothesized about her ability to kidnap and kill Defendant Dougherty with a sedative, calling her a 'nutcase' and a 'little girl', and laughing at her having a panic attack and being confused."

xxx.  "January '23: Defendant Dougherty berated Plaintiff Davis by text messages over completion of documents, calling her a 'stupid bitch' and 'cry baby' while Plaintiff Davis repeatedly asked Defendant Dougherty to stop messaging her."

xxxi.  "Defendant Dougherty threatened to 'hang [himself] in [his] cell' following his jail stay in Hillsboro."

xxxii.  "February '23: Defendant Dougherty became extremely furious over text, stating that he 'hated [his] life' and that he was going to 'have a nervous breakdown and cry' when Plaintiff Davis told him she could not spend time with him because she had a family medical emergency."

xxxiii.  "Defendant Dougherty made a myriad of derogatory remarks through text messages at Plaintiff Davis, stating: 'Quit being

13

demanding'; 'You're being controlling'; 'Quit being combative that is so unattractive': 'You didn't want to come today anyway you fucking cunt'; 'You're stupid fucking annoying bitch'; 'You need mood stabilizers'; 'Fuck you you stupid cunt'; 'I'm glad your mother is rotting in hell'; 'No believe me that bitch is in hell', all the while demonstrating extreme aggressive caused by Plaintiff Davis asking Defendant Dougherty to apologize after the first rude remark.'"

xxxiv.  "Defendant Dougherty blamed Plaintiff Davis for not being able to afford food for him, announcing their official break up and that he would be 'starving for the next 2 days' if she did not purchase him sushi. After supposedly breaking up with her, Defendant Dougherty proceeded to ignore all of Plaintiff Davis' worried texts until she told him when she would pick him up from jail, stating further that he 'hated her' and that she 'would never see [him] again'."

xxxv.  "April '23: Defendant Dougherty completely ignored Plaintiff Davis' text message that describe how much she was hurting over their broken marriage plans and relationship."

xxxvi.  "May '23: Defendant Dougherty told Plaintiff Davis that he "Can't take it right now ... I'm going to take a gun to my fucking head don't you understand that you fucking idiot" after Plaintiff Davis stated that it hurt her that Defendant Dougherty hung up on her when she was crying and needed 5 minutes of kindness."

    xxxvii. "Defendant Dougherty had multiple affairs with women while in a relationship with Plaintiff Davis, planning a wedding, and all the while reporting these instances to her."

    xxxviii. "Plaintiff Davis found out that Defendant Dougherty cheated on her by receiving a positive HPV test during her annual checkup. When confronted with this, Defendant Dougherty told Plaintiff Davis: 'Aren't you worried cause I am going to get throat cancer?' "

d.  "Defendant Dougherty's actions were both the actual and proximate cause of Plaintiffs injury."

e.  "Plaintiff Davis was diagnosed with PTSD following Defendant Dougherty's negligent conduct toward Plaintiff Davis."

f.  "Defendant Dougherty should have realized that his conduct involved an unreasonable risk of causing emotional distress."

g.  "Defendant Dougherty's actions created an unreasonable risk of causing emotional distress and that the distress was medically diagnosable and significant."

h.  "Plaintiff Davis was in the zone of danger and was placed in reasonable fear of physical injury due to Defendant Dougherty's actions."

i.  "Plaintiff Davis suffered severe emotional distress and mental injury that is medically diagnosable and of sufficient severity to be medically sufficient."

j.  "Plaintiff Davis suffered additional loss of wages, medical bills, and pain and suffering damages."

**THE INSURANCE POLICIES**

15

26.     State Farm issued a Condominium Unitowners Policy naming Sean Patrick Dougherty as the Named Insured, Policy Number 25-L9-6846-2, with effective dates of March 9, 2021 through March 9, 2022 (the "Policy").

27.     The Policy was renewed twice, with effective dates March 9, 2022 through March 9, 2023, and March 9, 2023 through March 9, 2024.  Certified copies of the Policy for each of the Policy periods 2021-2022, 2022-2023, and 2023-2024 are attached hereto as Exhibit B and incorporated by reference herein.

28.     The Policy contains personal liability coverage with a limit of $300,000 per occurrence.

29.     Prior to the Policy, State Farm previously issued a separate Condominium Unitowners Policy to Mr. Dougherty as the Named Insured, Policy No. 25-C8-D171-5, with effective dates of December 6, 2019 through December 6, 2020 (the "2019-2020 Policy").

30.     The 2019-2020 Policy was cancelled effective June 29, 2020.

31.     A certified copy of the 2019-2020 Policy is attached hereto as Exhibit C and incorporated by reference herein.

32.     The 2019-2020 Policy also contains personal liability coverage with a limit of $300,000 per occurrence.

33.     Both the Policies contain the following relevant provisions:

**DEFINITIONS**
\* \* \*

3.     **"bodily injury"** means physical injury, sickness, or disease to a person. This includes required care, loss of services, and death resulting therefrom.

**Bodily injury** does not include:
a.  any of the following which are communicable: disease, bacteria, parasite, virus, or other organism, any of which are transmitted by any **insured** to any other person;

    b.   the actual or alleged exposure to any such disease, bacteria, parasite, virus, or other organism by any **insured** to any other person; or

    c.   emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

* * *

11.    **"insured"** means:

    a.   **you;**

    b.   **your relatives;** and

    c.   any other person under the age of 21 in the care of a person described above.

Under Section II, **insured** also means:

    d.   the person or organization legally responsible for animals or watercraft to which this policy applies. However, the animal or watercraft must be owned by **you** or a person included in 11.b or 11.c. above. A person or organization using or having custody of these animals or watercraft in the course of a **business,** or without permission of the owner, is not an **insured;** and

    e.   with respect to any vehicle to which this policy applies, any person while engaged in **your** employment or the employment of a person included in 11.b or 11.c. above.

* * *

16.    **"property damage"** means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of property by any **insured** is not **property damage.**

* * *

**SECTION II – LIABILITY COVERAGES**

**COVERAGE L – PERSONAL LIABILITY**

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence, we** will:

1.    pay up to **our** limit of liability for the damages for which the **insured** is legally liable. **We** will not pay for criminal restitution; and

2.    provide a defense at **our** expense by counsel of **our** choice….

**SECTION II – EXCLUSIONS**

1.    Coverage L and Coverage M do not apply to:

    a.   **bodily injury** or **property damage** that:

        (1)   was a result of a:

            (a)   willful and malicious; or

            (b)   criminal;

            act or omission of the **insured;**

        (2)   was intended by the **insured;** or

17

(3) would have been expected by the **insured** based on a reasonable person standard.

However, exclusions a.(2) and a.(3) above do not apply to **bodily injury** or **property damage** resulting from the use of reasonable force to protect persons or property.

Exclusions a.(1), a.(2), and a.(3) above apply to all **bodily injury** or **property damage** even if the:

(1) **bodily injury** or **property damage** was sustained by a different person, entity, or property than was expected or intended;

(2) **bodily injury** or **property damage** was of a different kind, quality, or degree than was expected or intended;

(3) **insured** lacked the mental capacity to control his or her conduct;

(4) **insured** was not charged with or convicted of a criminal act or omission; or

(5) **insured** was impaired by drugs or alcohol;

\* \* \*

n. **bodily injury** or **property damage** arising out of any actual, alleged, or threatened:

(1) sexual harassment, sexual molestation, or sexual misconduct;

(2) physical or mental abuse; or

(3) corporal punishment;

by the **insured;**

\* \* \*

## CONDOMINIUM UNITOWNERS AMENDATORY ENDORSEMENT (Missouri)

\* \* \*

The definition of ***"occurrence"*** is replaced by the following:

***"occurrence",*** when used in Section II of this policy, means an accident, including accidental exposure to conditions, which first results in:

a. ***bodily injury;*** or

b. ***property damage;***

during the policy period. All ***bodily injury*** and ***property damage*** resulting from one accident, series of related accidents, or from continuous or repeated exposure to the same general conditions is considered to be one ***occurrence.***

\* \* \*

## <u>GROUNDS FOR DECLARATORY JUDGMENT</u>

28.     No coverage exists under the Policies for any of the allegations contained in the claims against Defendant Dougherty in the Underlying Petition.

## I.      No "Occurrence"

### *No "Occurrence" based on Timing of Alleged Injuries*

29.     The Policies provide that to be an "occurrence", an accident must "first result[]" in bodily injury or property damage "during the policy period".

30.     Furthermore, the Policies provide that all injuries "resulting from one accident, series of related accidents, or from continuous and repeated exposure to the same general conditions is considered to be one occurrence."

31.     The effective policy period for the 2019-2020 Policy was from December 6, 2019 to June 29, 2020.

32.     The effective policy period for the Policy was March 9, 2021 to March 9, 2024.

33.     All of the injuries alleged in the Underlying Petition—to the extent they allege any "accident" at all—arise out of one "series of related accidents" or "continuous and repeated exposure to the same general conditions" that already allegedly resulted in injury to Plaintiff long before any effective policy period began in 2019.  This is because the Underlying Petition alleges damages resulting from "a pattern of romance fraud" that "start[ed] around the end of 2015 and continu[ed] until May 2023." (Ex. A at ¶ 4).

34.     The Underlying Petition alleges that this "pattern of romance fraud" was carried on through "Dougherty's fraudulent misrepresents [sic] and violent coercion". (*Id.*)

35.     The first alleged injuries from these types of actions purportedly occurred no later than 2016, since the Underlying Petition alleges that Dougherty first convinced Davis to give him

money in March 2016 (*Id.* at ¶ 10), and that he allegedly "became for the first time violent with" Davis in June 2016 to convince her to drive him while his license was revoked (*Id.* at ¶ 11).

36.    Thus, to the extent the Petition could otherwise allege the elements of an "occurrence", the entire Petition alleges **one** occurrence which first resulted in injury no later than 2016, long **before** the first policy period began in 2019. Therefore, the injuries alleged in the Underlying Petition do not meet the Policies' definition of an "occurrence", which must "first result" in injury during the policy period.

37.    Alternatively, even if the allegations in the Underlying Petition were viewed separately rather than as one "occurrence", the incidents in the Underlying Petition that allegedly occurred from 2015 to December 6, 2019, and from June 30, 2020 to December 5, 2021, occurred outside any effective policy period and thus there is no coverage for those allegations.

38.    Specifically, the allegations in the following paragraphs of the Underlying Petition assert injuries occurring outside the effective policy periods:

   a.    Paragraphs 4-24 (alleging incidents from 2015 through April 2019);

   b.    Paragraphs 31-32 (alleging incidents in fall of 2020 and September 2020);

   c.    Paragraphs 40-46 of the Underlying Petition (alleging incidents in July and August 2020);

   d.    Paragraph 50 (alleging incidents beginning "around January of '21");

   e.    Subparagraphs a., b., c., d., and e., of Paragraph 88 within Counts 3-10 (alleging incidents from December 2018 through August 2020);

   f.    Subparagraphs a., b., c., d., e., f., and h. of Paragraph 94 within Count 11 (alleging incidents from June 2016 through October 2019, and in August 2020).

These allegations do not allege an occurrence because, even if they allegedly resulted in bodily injury or property damage, any such alleged injury occurred before the policy period. Thus, they do not allege an occurrence within the meaning of the Policies.

_No "Accident" resulting in "Bodily Injury or Property Damage"_

39.     The Policies provide coverage for claims against an insured for "damages because of **bodily injury** or **property damage** ... caused by an **occurrence**."  An "occurrence" is defined as "an accident" that results in "bodily injury" or "property damage".

40.     "Property damage" includes only "physical damage to or destruction of tangible property", not theft or conversion of property by any insured. "Bodily injury" is defined as "physical injury, sickness, or disease" but does not include emotional distress or similar mental injury unless it "arises out of actual physical injury to some person".

41.     There is no coverage for any of the claims in the Underlying Petition because none of them assert claims for "bodily injury" or "property damage" resulting from an "accident".

42.     **Count 1** of the Underlying Petition does not allege an occurrence because it does not allege an "accident". Count I alleges that Mr. Dougherty retained hundreds of thousands of dollars of money received from Plaintiff, causing her emotional distress, and that he "intentionally hurt Plaintiff" by unjustly retaining the funds. Because this Count alleges intentional behavior rather than an "accident", it does not allege an occurrence.

43.     Additionally, Count 1 fails to allege an occurrence because it does not allege bodily injury or property damage. It does not allege property damage because it asserts only monetary loss due to Dougherty's alleged non-repayment to Davis, rather than "physical damage to or destruction of tangible property". Likewise, it does not allege bodily injury because it alleges only emotional distress arising out of the monetary loss but not arising out of physical injury to any person. Thus, there is no coverage for Count 1.

44.     **Count 2** of the Underlying Petition does not allege an occurrence because it does not allege an "accident". Count II alleges that Dougherty made representations and promises to Plaintiff, that he "intended that Davis rely on" those promises, and that he "intended to harm Plaintiff" by means of those false promises. Because this Count alleges intentional behavior rather than an "accident", it does not allege an occurrence.

45.     Additionally, Count 2 fails to allege an occurrence because it does not allege bodily injury or property damage. It does not allege property damage because it asserts only monetary loss due to Dougherty's alleged non-repayment to Davis, rather than "physical damage to or destruction of tangible property". Likewise, it does not allege bodily injury because it alleges only emotional distress arising out of the monetary loss but not arising out of physical injury to any person. Thus, there is no coverage for Count 2.

46.     **Counts 3 through 10** of the Underlying Petition likewise fail to allege an occurrence triggering coverage because they fail to allege an "accident". These Counts assert claims for "Assault and Battery" arising out of eight different alleged incidents where Davis claims Mr. Dougherty physically harmed or threatened to harm her.

47.     Davis alleges that all of the alleged incidents underlying Counts 3-10 were "intended to harm" her.

48.     Moreover, since these Counts assert claims for *intentional* torts of assault and battery, intent is an essential element of these claims such that Davis can only recover damages against Dougherty under these claims to the extent that Dougherty's alleged actions were intentional.

49.     Thus, because these Counts necessarily involve allegations of intentional actions, they do not allege an "accident" and therefore do not allege an "occurrence."  Accordingly, there is no coverage under the Policies for Counts 3 through 10 of the Underlying Petition.

50.     **Count 11** of the Underlying Petition, for Negligent Infliction of Emotional Distress, fails to allege an occurrence because all the allegations on which it is based either did not result in bodily injury or were not accidental.

51.     *First*, many of the allegations in Count 11 did not result in "bodily injury" or property damage (and the claim in Count 11, for Negligent Infliction of Emotional Distress does not assert any damages for property damage).

52.     To qualify as a "bodily injury" within the  meaning of the Policies, emotional distress must "arise[ ] out of actual physical injury to some person".

53.     The allegations contained in subparagraphs c., d., e., f., g., h., i., j., k., l., m., n., p., t., v., w., x., y., z., aa., bb., cc., dd., ee., ff., gg., hh., ii., jj., kk., and ll. of Paragraph 94 of the Underlying Petition (i.e., all subparagraphs of Paragraph 94 except subparagraphs a., b., o., and u.) do not allege emotional distress resulting from an "actual physical injury to some person". Instead, those subparagraphs allege rude, offensive, or disturbing behaviors—for example, that Dougherty threatened to date or sleep with other women, verbally abused Plaintiff, forgot Plaintiff's birthday, convinced her to spend money on him, threatened to kill himself, suggested that he and Plaintiff commit suicide together, openly shared violent fantasies of killing people, and other similar allegations—but not "actual physical injury to some person".

54.     Because Davis's alleged emotional distress based on the allegations listed above did not arise out of actual physical injury to some person, those allegations do not allege an

occurrence within the meaning of the Policy, regardless of whether they allege accidental behavior by Dougherty.

55.     *Second*, the only other allegations in Count 11 that might allege injury to Davis arising out of actual physical injury to some person fail to allege an occurrence because they do not allege an "accident". Specifically:

    a.  Subparagraph "a." of Paragraph 94, alleging that Dougherty became "violent and aggressive" with Davis, to the extent it asserts a bodily injury from Dougherty allegedly "shoving" Davis, (Ex. A, at ¶ 11), alleges intentional behavior rather than an accident.

    b.  Subparagraph "b." of Paragraph 94, alleging that Dougherty related to Davis that he had a "violent boost [sic]" in an AT&T store and attacked a customer, to the extent it alleges emotional injury sustained by Davis, does not allege an accident, because the Underlying Petition asserts that Dougherty intentionally told this to Davis to produce a desired emotional reaction in her: "Dougherty used this and other incidents of violence to send a message to Davis that she had to comply with his demands, or else." (Ex. A, ¶ 12).  The same is true of Paragraph 37—which alleges that Dougherty told Davis about injuring a husband of another woman—to the extent Count 11 incorporates the allegation in that Paragraph.

    c.  Subparagraph "o." of Paragraph 94, alleging that Defendant caused Davis pain by "disregard[ing]" her physical condition during sexual intercourse and that he "would not let Davis free", alleges intentional and knowing behavior rather than an accident resulting in unforeseen injuries from Dougherty's standpoint;

24

     d.   Subparagraph "u." of Paragraph 94, alleging that Dougherty "forced" Davis to watch videos of abuse toward other women, is not an allegation of an accidental or unforeseen event from the standpoint of Dougherty, since "forcing" another person to do something is an intentional act. Moreover, the Underlying Petition elsewhere alleges that Dougherty did this with a particular goal in mind: in order to "groom Davis to be complicit with his violence toward her." (Ex. A, at ¶ 49). Thus, this is an allegation of intentional behavior, not an accident.

56.    Thus, even the allegations that might involve a "bodily injury" in Count 11 are allegations of intentional behavior, not the type of accidental behavior that would meet the definition of an "occurrence" under the Policies.

57.    Thus, because there are no allegations within Count 11 which allege an accident resulting in bodily injury or property damage, there is no coverage for Count 11 under the Policies.

58.    In short, none of the allegations in the Underlying Petition allege an occurrence, because none of them allege an "accident" that first resulted in "bodily injury" or "property damage" during the policy period.  All of the allegations were allegedly part of a pattern of romance fraud that began and allegedly resulted in injury *before* the Policy period.  Furthermore, Counts 1 and 2 fail to allege bodily injury or property damage. Counts 1–10 allege injuries arising only from intentional behavior by Dougherty, not from an "accident". And all of the allegations in Count 11 either assert injuries that occurred before the Policy period, or fail to allege a bodily injury, or allege intentional rather than accidental behavior.  Thus, no occurrence is alleged, and there is no coverage for any claims in the Underlying Petition under the Policies.

## II.    Intended/Expected Injury Exclusion

59.     The Policies exclude coverage in Exclusion 1.a for injury that is a result of a "willful and malicious" conduct by the insured, or which was intended by the insured, or which "would have been expected by the insured based on a reasonable person standard".

60.     As discussed above, **Counts 1–10** of the Underlying Petition are based entirely on allegations of intentional behavior by Dougherty.

61.     Furthermore, the element of intent is essential to those claims for intentional torts.

62.     Therefore, to the extent Counts 1–10 of the Underlying Petition allege any actionable injuries, such injuries would be "expected or intended" from the standpoint of Dougherty.  Therefore, these Counts are excluded from coverage under Exclusion 1.a.

63.     Likewise, the only allegations in **Count 11** that might involve some sort of bodily injury during the Policy period—namely, subparagraph "a.", "b.", "o.", and "u." of Paragraph 94 of the Underlying Petition—allege intentional behavior by Dougherty, for the same reasons set out above (*See supra*, ¶ 55).  Thus, these allegations assert injuries that either were a result of "willful and malicious" acts of Dougherty, or were "intended by" Defendant Dougherty, or would have been expected by Dougherty based on a reasonable person standard.  Therefore, these allegations are excluded from coverage under Exclusion 1.a. of the Policy.

64.     Thus, any "bodily injury" that might be alleged in Count 11 is also alleged to have been a result of a willful and malicious act of the insured, or intended by the insured, or expected by the insured based on a reasonable person standard. Therefore all such alleged injuries are excluded from coverage under Exclusion 1.a.

### III.     Physical or Mental Abuse Exclusion

65. The Policy also excludes coverage in Exclusion 1.n for injury arising from sexual harassment or misconduct or "physical or mental abuse". The term "mental abuse" is not further defined in the Policy.

66. All the allegations in Plaintiff's Amended Petition, including the allegations in Count 11 that appear to be based on some bodily injury and have occurred during the Policy period, allegedly occurred as part of an overall scheme that was designed to emotionally manipulate and "control" Plaintiff.

67. Indeed, the Underlying Petition alleges that all of Davis's injuries were caused by Dougherty's "a pattern of romance fraud" and refers to Dougherty's pattern of behavior as "emotional abuse". (Ex. A, at ¶¶ 4, 59). Thus, all the injuries alleged in the Underlying Petition are injuries arising from "physical or mental abuse".

68. All of the injuries alleged in each of the individual Counts 1 through 11 of the Underlying Petition are injuries that allegedly arose from "physical or mental abuse" and are therefore excluded from coverage under the Policies by Exclusion 1.n.

69. Of particular importance, among others, the allegations contained in or supporting Count 11 that might be read as alleging a bodily injury—namely, subparagraph "a.", "b.", "o.", and "u." of Paragraph 94 of the Underlying Petition—nevertheless allege injuries arising out of physical or mental abuse, particularly but not solely in the following respects:

    a. Paragraph 94.b (alleging that Dougherty told Davis about attacking a customer in an AT&T store), together with Paragraphs 37 and 12 (alleging that Dougherty told Davis about beating up another woman's husband and that he would tell Davis about incidents of violence such as the AT&T store incident in order to "send a message… to comply with his demands, or else");

27

      b. Paragraph 94.o., which alleges that Dougherty caused Davis "excruciating pain" during sexual intercourse by disregarding her physical condition;

      c. Paragraph 94.u. and 49, alleging Dougherty forced Davis to watch videos of abuse to other women to "groom[] Davis to be complicit with his violence toward her".

Because these Paragraphs allege injuries arising from "physical or mental abuse", these allegations are therefore excluded from coverage under Exclusion 1.n. of the Policies.

WHEREFORE, Plaintiff State Farm Fire and Casualty Company prays that this Court declare the rights of the parties under the aforementioned Policy of insurance and enter judgment finding and declaring:

      a. That the provisions of the Policy provide no coverage whatsoever for the Underlying Claims against Defendant Sean Patrick Dougherty;

      b. That State Farm has no duty to defend Defendant Sean Patrick Dougherty in any legal proceedings related to the Underlying Claims;

      c. That State Farm has no duty to indemnify Defendant Sean Patrick Dougherty for any portion of any expense or liability that he has incurred or may incur in any legal proceeding related to the Underlying or any future settlement, judgment, or civil penalties that may be entered against Defendant Sean Patrick Dougherty, in any other action against Defendant Sean Patrick Dougherty arising out of the conduct described in the Underlying Claims;

      d. That State Farm has no duty to satisfy any judgment that may be entered against Defendant Sean Patrick Dougherty in favor of Defendant Amber Davis, either in the Underlying Action or arising out of the conduct described in the Underlying Claims against Defendant Dougherty;

e.      That State Farm is entitled to its costs, including attorney fees; and

f.      That State Farm is entitled to any such further relief this Court deems just and proper under the circumstances.

Respectfully submitted,

HEPLERBROOM LLC

By: _/s/  Patrick A. Bousquet_
    Patrick A. Bousquet        #57729MO
    Peter A. Houser            #71278MO
    email: patrick.bousquet@heplerbroom.com
    peter.houser@heplerbroom.com
    701 Market Street, Suite 1400
    St. Louis, Missouri 63101
    314-241-6160 phone
    314-241-6116 fax
    ATTORNEYS FOR PLAINTIFF